## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **SUUQA BAKARO GROCERY** AND **MAHDI IROBE,** | ) ) ) | |
| **PLAINTIFFS** | ) ) | **CIVIL NO. 2:16-CV-254-DBH** |
| **v.** | ) ) | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE,** | ) ) ) | |
| **DEFENDANT** | ) ) | |

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Suuqa Bakaro Grocery and Mahdi Irobe seek judicial review of the United States Department of Agriculture (USDA)'s decision to disqualify them from participation in the Supplemental Nutrition Assistance Program (SNAP) due to their alleged trafficking of SNAP benefits.  The USDA has moved for summary judgment (ECF No. 18); the Grocery and Irobe oppose it (ECF No. 20).  After hearing oral argument on July 20, 2017, I conclude that there is no genuine issue of material fact and therefore **GRANT** the USDA's motion.

### FACTS

Many of the facts are stipulated.  Parties' Joint Factual Stipulations (ECF No. 15) (JFS).  When they are not, I take the plaintiffs' version when properly supported by the record.

Mahdi Irobe owns Suuqa Bakaro Grocery, a small grocery store in Lewiston that predominantly serves Somali immigrants.  JFS ¶ 12.  The store carries several standard items, such as rice, flour, oil, sugar, and pasta, in addition to fresh camel and goat meat, frozen okra and tilapia, and a limited selection of fresh produce.  JFS ¶ 12.  On May 28, 2015, Irobe applied to become an authorized SNAP retailer, JFS ¶ 13, and the store was subsequently authorized to participate in SNAP as a retailer on June 20, 2015, JFS ¶ 15.

To combat hunger and malnutrition among low-income households, Congress authorized SNAP as part of the Food Stamp Act, 7 U.S.C. § 2011; JFS ¶ 1.  The program allows low-income households "to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation."  7 U.S.C. § 2011.  Households that qualify for SNAP participation receive electronic benefit transfer cards (EBTs), which effectively function as debit cards and allow participants to purchase eligible food items at certain stores.  7 U.S.C. § 2012(k); JFS ¶ 2.

USDA regulations prohibit trafficking, or the exchange of SNAP benefits for cash.[1]  To combat trafficking, the USDA employs a variety of technological and investigatory tools.  <u>E.g.</u>, <u>Fraud</u>, U.S. Dep't of Agriculture, https://www.fns.usda.gov/fraud/what-snap-fraud.  The agency collects electronic records of each EBT transaction in a national database, including the

---

[1] Trafficking is defined as "[t]he buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone."  7 C.F.R. § 271.2.

date, time, amount, store, and household identification for the transactions.  JFS ¶ 6.  This database in turn generates ALERT (Anti-Fraud Locator using EBT Retailer Transactions) reports that monitor and identify suspicious transactions. JFS ¶ 7.  The ALERT reports allow the USDA's Field and Nutrition Service (FNS) field officers to identify particular retailers and transactions with statistically unusual patterns indicative of trafficking, such as multiple transactions made sequentially in a short time frame, multiple withdrawals from individual accounts at a rapid pace, transactions that exhaust most of a household's SNAP benefits in a short time, and high-dollar-value sales from small retailers that have limited physical space.  JFS ¶¶ 7–8.

Soon after Suuqa Bakaro Grocery began accepting SNAP benefits, the transaction monitoring program showed patterns consistent with EBT trafficking violations.  JFS ¶ 20.  To that end, the Field and Nutrition Service initiated an investigation, closely reviewing the transaction history from July through October 2015 and directing contractors to visit the store on November 15 and December 4, 2015.  JFS ¶ 20.  Following the investigation, the section chief of the Service's Retailer Operations Division for New England sent the plaintiffs a letter advising them of the investigation results and the agency's conclusion to charge the store with tracking violations, namely 509 in total.[2]  JFS ¶¶ 21, 23–26.

---

[2] The 509 figure is the sum of the flagged transactions in each of the four attachments.  See JFS ¶¶ 23–26.

The charge letter flagged four categories of EBT transactions, with four corresponding attachments, suggesting trafficking behavior:  (1) numerous consecutive transactions conducted "too rapidly to be credible," (2) multiple transactions conducted from individual benefit accounts in "unusually short time frames," (3) sets of transactions where individual recipient benefits were "exhausted in unusually short periods of time," and (4) "excessively large purchase transactions made from recipient accounts."  JFS ¶¶ 21–22; A.R. 608 (ECF No. 14).  In a response letter, the plaintiffs' counsel offered alternative explanations to account for the alleged trafficking conduct, along with receipts for inventory purchased from May to December 2015.  JFS ¶ 33.  After reviewing the response, the Service maintained its original conclusion from the EBT transaction data and permanently disqualified the plaintiffs from participating in the SNAP program.  JFS ¶ 34.  The plaintiffs subsequently sought a review of the decision by the Administrative Review Board, JFS ¶ 35, which ultimately affirmed the permanent disqualification, JFS ¶ 37.  The plaintiffs then brought suit in this court (ECF No. 1), requesting judicial review of the disqualification decision.  7 U.S.C. § 2023(a)(13).

## STANDARD OF REVIEW

In reviewing the agency's decision, I conduct a de novo review to determine whether a violation occurred.  7 U.S.C. § 2023(a)(15); Broad St. Food Mkt., Inc. v. United States, 720 F.2d 217, 220 (1st Cir. 1983); Collazo v. United States, 668 F.2d 60, 65 (1st Cir. 1981).  This means that I accept new evidence and am not bound by the agency record.  Hajifarah v. United States, 779 F. Supp. 2d 191,

204 (D. Me. 2011); <u>accord</u> <u>Ibrahim v. United States</u>, 834 F.2d 52, 53–54 (2d Cir. 1987).  But the plaintiffs must show by a preponderance of the evidence that a violation did *not* occur.  <u>See</u> 7 U.S.C. § 2023(a)(15); <u>Ganesh v. United States</u>, 658 F. App'x 217, 219 (6th Cir. 2016) (citing <u>Warren v. United States</u>, 932 F.2d 582, 586 (6th Cir. 1991)); <u>Nadia Int'l Mkt. v. United States</u>, No. 16-364-cv, 2017 WL 1493687, at *2 n.1 (2d Cir. Apr. 26, 2017) (citing <u>Fells v. United States</u>, 627 F.3d 1250, 1253 (7th Cir. 2010)); <u>Hajifarah</u>, 779 F. Supp. 2d at 204.[3]

In evaluating the defendant's motion, I note that "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id</u>. at 322–23 (quoting Fed. R. Civ. P. 56(c)).

## ANALYSIS

The Food Stamp Act provides for permanent disqualification upon "the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store."  7 U.S.C. § 2021(b)(3)(B).  In other words, "even a single incident of trafficking is enough to justify permanent disqualification."  <u>Rockland</u>

---

[3] In <u>Nadia</u>, the Second Circuit noted but did not decide the burden of proof issue.  2017 WL 1493687, at *2 n.1.

Convenience Store v. United States, No. 10-cv-260-LM, 2011 WL 5120410, at *8 (D.N.H. Oct. 27, 2011).  To survive summary judgment, the plaintiffs "must raise material issues of fact as to *each* alleged violation."  Ganesh, 658 F. App'x at 219 (quoting McClain's Mkt. v. United States, 214 F. App'x 502, 505 (6th Cir. 2006)); see also Eltaweel v. U.S. Dep't of Agric., No. 14-409-M-LDA, 2016 WL 1572880, at *2 (D.R.I. Apr. 18, 2016) (summary judgment is appropriate when the plaintiff "fails to demonstrate a material dispute of fact as to the existence of a violation"). This is a very tall hurdle to surmount.  The USDA can use its vast collection of electronic data to show that hundreds of transactions are fraudulent, and then the retailer must prove the validity of each one.  But of course there is a strong government and taxpayer interest in keeping the program free of fraud.

The agency may base its findings of a violation on "facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system." 7 U.S.C. § 2021(a)(2).  Here, FNS relied upon hundreds of suspicious transactions from the EBT transaction data from July to October 2015, categorized into four attachments:  (1) multiple transactions conducted too quickly to be credible, (2) multiple transactions conducted in unusually brief time periods, (3) transactions that depleted the majority or all of individual recipient benefits in unusually brief time periods, and (4) multiple purchases of unusually high dollar amounts.  JFS ¶ 22; A.R. 730.  The first attachment contained 103 sets of back-to-back transactions made at the same terminal in rapid pace, ranging from 32 seconds to eight minutes and 27 seconds.  JFS ¶ 23;

A.R. 731.  The second attachment included 125 transactions conducted in 58 sets of two or more, by 41 households in under 24 hours, with the total amounts of each set over $100.00.  JFS ¶ 24; A.R. 733.  The third attachment listed 76 transactions for 35 households where the household used 90% or more of its monthly benefits in under 9 hours.  JFS ¶ 25; A.R. 737.  The fourth attachment showed 205 individual EBT transactions in amounts from $174.03 to $1,050.00, including 75 transactions exceeding $300.00.  JFS ¶ 26.  These listed transactions were over 279 percent higher than the average SNAP purchase amount at similar stores in Androscoggin County.  A.R. 741.

The plaintiffs do not dispute the accuracy or methodology of the EBT transaction data.  Instead, they argue that the record contains evidence that "provides a credible alternate explanation for the inference drawn" from the EBT data.  Pls.' Obj. to Def.'s Mot. Summ. J. 5 (ECF No. 20).  They point primarily to certain inventory receipts and store visits by FNS contractors on June 11, 2015, November 15, 2015, and December 4, 2015,[4] contending that such evidence raises a factual dispute that the store was not trafficking, but legitimately selling groceries.  Pls.' Obj. to Def.'s Mot. Summ. J. 5–6 (ECF No. 20).  The plaintiffs also draw from Mahdi Irobe's deposition testimony, asserting that customers would "often times" arrive at the store in large groups, "[i]t was not uncommon" for Irobe to conduct additional transactions after customers had forgotten portions

---

[4] The plaintiffs assert that "[n]one of the surveys done by Defendant of the Grocery in June, November and December of 2015 indicate that there were no food items available for purchase," and that if the Grocery made false inventory orders, then the store visits would show "a store that was overrun with items that were not selling."  Pls.' Obj. to Def.'s Mot. Summ. J. 5–6 (ECF No. 20).

of their initial orders, and "[f]rom time to time" he would allow customers to take food from the store without payment when they had exhausted their monthly benefits.  Pls.' Statement of Material Facts ¶¶ 14–22 (ECF No. 21-1) (Pls.' SMF). The plaintiffs further posit that Irobe would quickly calculate and process payments for commonly purchased commodities and sales where groups of customers ordered the same items, thereby making it possible for rapidly conducted transactions in short periods of time.  Pls.' SMF ¶¶ 17–18; Def.'s Response to Pls.' Statement of Material Facts ¶¶ 17–18 (ECF No. 25) (Def.'s RSMF).

Except through their lawyer's argument, the plaintiffs nowhere explicitly deny that they engaged in trafficking or assert that every transaction was valid.[5] The administrative record contains hundreds of transactions, from July to October 2015, that are indicative of trafficking.  JFS ¶¶ 23–26; A.R. 729–748. Yet the plaintiffs' explanations have made no reference to any specific transactions from the ample EBT transaction data reviewed by FNS.  They have stipulated the store's notable physical and spatial limitations, namely:  (1) the store contained a single checkout counter with dimensions of 2.5 by 1.5 feet, (2) the checkout counter lacked optical scanners, (3) the store did not provide shopping baskets or carts for customers, (4) the store's size measured around 800 square feet, and (5) in lieu of a cash register system, Irobe used a calculator to manually determine the purchase amounts and did not maintain records of

---

[5] Mr. Irobe was present in the Grocery much of the time, but he was often not present in the evening, and his brother-in-law, Hassan Abdi, then would manage the sales.  JFS ¶¶ 18–19.

individual transactions. JFS ¶¶ 14, 17. The parties stipulate that there were 45 SNAP-authorized retail stores within a one-mile radius of the Grocery, including two super stores and several international stores also frequented by Suuqa Bakaro's customers, such as Mashallah Store, Al Fatah, Mogadishu Store, Al Madina Store, Global Market Café, Al Qubus, and Dayah Store. JFS ¶ 16.

Accepting the plaintiffs' facts (as distinguished from their arguments)[6] and viewing any factual disputes in the light most favorable to the plaintiffs, I determine that the inventory receipts and proffered explanations fail to account for the numerous questionable transactions identified in the EBT data. The receipts may show that the store made some valid purchase orders during the review period,[7] but do not properly rebut the considerable statistical data documenting illegitimate transactions. See Savera Super Store, LLC v. United States, No. 14-cv-554-JD, 2016 WL 55274, at *4 (D.N.H. Jan. 5, 2016) ("[E]vidence of some legitimate repeat purchases does not undermine the

[6] At oral argument, the plaintiffs' counsel requested that I consider her notes and summaries of interviews she conducted with 21 Grocery customers who denied selling their SNAP benefits, which were part of the administrative record. Yet on de novo review, "[t]he record in the district court, not the record before the agency, is what counts." Ibrahim, 834 F.2d at 54 (2d Cir. 1987) (quoting McGlory v. United States, 763 F.2d 309, 311 (7th Cir.1985)). Counsel's notes and summaries of the customer interviews constitute inadmissible hearsay under the Federal Rules of Evidence, and the plaintiffs have submitted no other sworn statements or testimony from the customers for the record in this court. Cf., e.g., Abdel v. United States, 670 F.2d 73, 76 (7th Cir. 1982); Lopez v. United States, 962 F. Supp. 1225, 1229 (N.D. Cal. 1997). Moreover, even if I were to consider the interview notes and summaries, the parties have stipulated that none of the interviewed customers was able to provide the plaintiffs' counsel with EBT card numbers matching the questionable transactions identified in the charge letter. JFS ¶ 35.

[7] The plaintiffs contend that the Grocery purchased $176,956.86 in inventory from May to December 2015. Pls.' SMF ¶ 25. The defendant disputes this total, pointing to the administrative record that shows a total inventory of $165,640.20. Def.'s RSMF ¶ 25; A.R. 420–21. Even accepting the plaintiffs' calculated total, I conclude that the legitimate purchase of food inventory alone cannot justify the high volume of suspicious transactions here. Similarly, the three store visits in 2015 need not have shown "a store that was overrun with items that were not selling," see supra note 4, for the plaintiffs to have engaged in at least one of the many cited instances of trafficking.

evidence that other transactions on EBT cards were not legitimate."). Instead of justifying particular transactions cited in the EBT data, the plaintiffs' offered explanations amount to little more than vague generalities and speculation. Even if true for certain transactions and customers, the explanations still do not plausibly account for the hundreds of transactions made in such rapid sequence, in such short periods of time, depleting such a significant portion of individual receipt benefits, and involving such high purchase amounts, particularly "in light of the store's location, lay-out, and limited inventory." Saudabad Convenience, Inc. v. U.S. Dep't of Agric., No. 013-298-ML, 2014 WL 611194, at *6 (D.R.I. Feb. 18, 2014).

For instance, it may be the case that expensive camel and goat meat was not available at other neighboring stores,[8] Pls.' SMF ¶¶ 9–12, but such a broad assertion does not explain how, in under an hour on August 11, 2015, household *873A could have legitimately transacted $159.00 at the nearby Mogadishu Store, $300.00 at Suuqa Bakaro Grocery, $165.01 at the nearby Mashallah Store, and an additional $83.00 at Suuqa Bakaro. JFS ¶ 27. It also could be the case that "[s]ometimes" Irobe would conduct second transactions following the first to account for forgotten items or amounts previously owed. Pls.' SMF ¶¶ 19, 21, 23. Yet such generalities cannot justify all the 103 pairs of

---

[8] The defendant contends that the invoices provided by the plaintiffs do not show sufficient quantities of camel and goat meat that would account for the volume of questionable transactions, noting that the plaintiffs purchased only $561.85 of camel meat during the review period and fifteen total goat carcasses during July and August 2015. Def.'s RSMF ¶ 9. The defendant also disputes that camel and goat meat were "expensive items" not available in other local markets. Def.'s RSMF ¶¶ 10–12. I accept the plaintiffs' accounts of the camel and goat meat purchases as true for purposes of the motion, but the purchases do not explain the abundance of suspicious EBT transactions.

consecutive transactions made in under 9 minutes, such as on September 11, 2015, when household *873A transacted $320.00, an additional $100.00 68 seconds later, and $83.00 thirteen minutes later, or on October 11, 2015, when three different households each conducted transactions of $105.00, $94.00, and $360.00 in under four minutes.  JFS ¶ 23.  Indeed, it strains credulity to believe that "hundreds of dollars of transactions could be completed between several seconds or minutes in a small convenience store with minimal counter space, no shopping carts, and [no electronic] cash register system." Eltaweel v. U.S. Dep't of Agric., No. 14-409-M-LDA, 2016 WL 1572880, at *3 (D.R.I. Apr. 18, 2016); see also A Touch of Merengue, LLC - The Atom v. United States, No. 14-117-M, 2014 WL 6609478, at *4 (D.R.I. Nov. 20, 2014) (granting summary judgment when the plaintiff's proffered "explanations and the scant evidence are unconvincing, conclusory, and speculative in the face of the USDA's statistics").

The standard of review that applies here—a de novo record with the burden on the plaintiffs to show that there was not a single fraudulent transaction—is unusual.  But given that "only one instance of . . . trafficking is sufficient to establish a violation," I conclude that the plaintiffs have failed to meet their burden of rebutting each of the flagged transactions.  Nadia Int'l Mkt. v. United States, No. 5:14-cv-82, 2015 WL 7854290, at *7 (D. Vt. Dec. 2, 2015), aff'd, No. 16-364-cv, 2017 WL 1493687 (2d Cir. Apr. 26, 2017) (quoting Kahin v. United States, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000)).  Based upon my de novo review, I conclude that the plaintiffs have failed to raise a genuine issue of material fact, and I therefore uphold the agency's finding that the plaintiffs

engaged in trafficking.  As both parties correctly acknowledge, if trafficking occurred, the only proper sanction authorized by the Food Stamp Act was permanent disqualification.  7 U.S.C. § 2021(b)(3)(B).

## CONCLUSION

The defendant's motion for summary judgment is **GRANTED**.

**SO ORDERED.**

**DATED THIS 24TH DAY OF JULY, 2017**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**